IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

SCHIEFFER V. SCHIEFFER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JESSICA N. SCHIEFFER, APPELLEE,

V.

RYAN V. SCHIEFFER, APPELLANT.

Filed June 2, 2020.    No. A-18-1090.

Appeal from the District Court for Cedar County: PAUL J. VAUGHAN, Judge. Affirmed in part as modified, and in part reversed and remanded with directions.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellant.

Wanda Howey-Fox, of Harmelink & Fox Law Office, P.L.L.C., for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The marriage of Ryan V. Schieffer and Jessica N. Schieffer was dissolved by a decree entered by the Cedar County District Court. The district court awarded joint legal and physical custody of the children to the parties in November 2016 after a contested temporary custody hearing. Following trial in January 2018, the court awarded Jessica sole legal and physical custody. On appeal, Ryan challenges matters related to the marital estate, custody of the parties' two minor children, child support, and attorney fees. We (1) modify certain premarital and marital values and the judgment amount owed to Jessica to equalize the marital estate; (2) reverse the award of sole physical custody and remand for entry of an award of joint physical custody, with the parenting plan modified to restore the week on/week off parenting schedule the parties had exercised for 14 months preceding trial under a temporary order; and (3) reverse the child support judgment and

- 1 -

remand for recalculation using a joint physical custody worksheet. In all other respects, the decree is affirmed.

## II. BACKGROUND

Jessica and Ryan wed on June 1, 2012, and have two sons: Jasper, born in 2013, and Eli, born in 2015. Jessica has another son, Dillon, born in 2010, from a previous relationship. The parties lived on a 40-acre farm in Crofton, Nebraska, which included their home, outbuildings, a hog facility, cattle yards, and 23 acres of dryland and crop ground (the Acreage). Jessica filed for divorce in July 2016 (filing not in record; referred to in decree). Jessica filed an amended complaint in August, and Ryan filed an answer and counterclaim. Jessica sought primary physical custody of the children, and Ryan sought joint legal and physical custody. In Jessica's answer to Ryan's counterclaim, she disputed that joint legal and physical custody was warranted. She then requested sole legal and physical custody of Jasper and Eli subject to Ryan's parenting time "provided that [Ryan] is sober and not consuming intoxicating liquors or other substances."

After a contested hearing in October 2016, a temporary order was filed on November 8. As relevant to the issues on appeal, the parties were granted joint legal and physical custody of Jasper and Eli with a week on/week off schedule and alternating holidays. Starting November 1, Ryan was ordered to pay $157 per month in child support for the parties' two children. Jessica was awarded the temporary exclusive use of the marital home and was responsible for servicing the debt and expenses related to it. Ryan was not allowed to enter that home "for any reason" and had to "remain 100 feet away from [it] during the time he [was] on the surrounding farm ground"; Jessica's counsel had alleged that a July 11 domestic abuse protection order prohibited Ryan from "threatening, molesting, attacking, or otherwise disturbing [Jessica's] peace." Each of the parties were to take care of debt on one of two joint credit cards. Ryan was ordered to service the marital debt consisting of "the operating loan and cattle loan." The court believed Jessica's request for $2,000 a month in alimony was excessive due to the "relative comparable financial circumstances of the parties," but recognizing her obligation for child support for one child from a previous relationship, ordered Ryan to pay alimony in the amount of $250 per month beginning in November.

In March 2017, the district court entered an "Order on Temporaries," after a hearing took place on a motion Ryan filed for temporary exclusive use of the marital home. The court noted that it had awarded temporary exclusive use of the marital home to Jessica and that she was responsible for servicing the debt and expenses related to the home. The evidence showed Jessica had not been making payments on the loan, which the court observed covered the 40 acres plus the marital home. However, the court noted that Jessica took no action to clarify her obligation under the court's order. "She hasn't paid anything related to this loan." The monthly payment of $354.78 was "now five months past due." Jessica was ordered to bring the loan current by March 17. Another hearing on this matter took place on May 22. Ryan again sought temporary exclusive use of the marital home due to Ryan receiving notices about having to pay off delinquent sums (home debt) by May 26 to stop a financial institution from taking action. On May 25, the district court issued another temporary order, finding that Jessica was in default on the debt for the marital home less than 2 months after being given a chance to bring the debt current and remain in that

home. The court noted that Jessica "has not been able to maintain stable employment and the prospect for future default is of concern to the Court. This has and will continue to damage the credit ratings for both parties." Jessica was ordered to vacate the marital home by June 18, at which time Ryan would be allowed exclusive use of that residence and be responsible for the mortgage and other debts upon it.

At a hearing in November 2017, Ryan moved for authority to sell marital assets while the case was pending. Farm Credit Services of America (FCS) had filed a breach of contract and replevin action against the parties as it held a security instrument in some marital property and two loans were in default. Ryan wanted to liquidate the cattle herd to satisfy the FCS amount due. This would eliminate the action brought against the parties. Jessica requested that Ryan provide an accounting of all livestock sold since July 27, 2016 (alleged date initial complaint filed) and for checks to be made payable to Jessica, Ryan, and FCS. Jessica alleged that evidence showed Ryan had been selling livestock and dissipating marital assets, something Ryan disputed. The district court orally stated it would grant Ryan's motion to allow him to sell livestock to satisfy the pending FCS action, order checks for those sales to be payable to both parties and FCS, and order that Ryan provide an accounting of all sales of any assets from the time the instant case was filed. Ryan was to deliver the accounting no later than December 4, 2017.

Trial took place on January 3 and 4, 2018. Each party presented evidence, which will be discussed in our analysis where relevant to the issues on appeal.

The decree dissolving the marriage was entered on October 29, 2018. The district court granted Jessica sole legal and physical custody of Jasper and Eli, subject to Ryan's parenting time as set forth in a parenting plan attached to the decree--every other weekend from 5 p.m. on Friday until 5 p.m. on Sunday, every Wednesday from 4 p.m. to 7 p.m., alternating holidays, 3 continuous weeks during school summer vacation, and weekly telephone time from 6 p.m. to 6:30 p.m. on Tuesdays. Ryan was ordered to pay child support of $736.46 per month starting November 1 for the parties' two children.

To equalize the marital estate, Ryan was ordered to pay Jessica $121,598.34 plus interest accruing at the statutory rate from the date of the decree--$5,000 to be paid upon entry of decree and balance to be paid within 5 years at rate of at least $1,900 monthly until property equalization amount paid in full. Ryan was to be responsible for "all farm-related indebtedness" and was awarded all of the "farm-related assets." Jessica was to execute a quitclaim deed in Ryan's favor for the marital home upon receipt of the property equalization payments. No alimony was awarded. Ryan was ordered to pay $10,000 of Jessica's attorney fees.

Ryan appeals.

## III. ASSIGNMENTS OF ERROR

Ryan claims, restated and reordered, that the district court erred by (1) incorrectly identifying, valuing, and dividing the marital assets; (2) awarding sole legal and physical custody to Jessica; (3) applying the wrong standard of proof in determining custody; (4) awarding excessive child support; (5) awarding Jessica attorney fees; and (6) ordering him to pay more to Jessica than he earns.

## IV. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support or a modification of an existing order of support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## V. ANALYSIS

### 1. DIVISION OF MARITAL ESTATE

In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. *Stanosheck v. Jeanette, supra*. The first step is to classify the parties' property as marital or nonmarital. *Id*. The second step is to value the marital assets and marital liabilities of the parties. *Id*. The third step is to calculate and divide the net marital estate between the parties. *Id*. The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case. *Id*. Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006).

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Generally, the date on which a court values the marital estate should be rationally related to the property composing the marital estate. *Id*.

In a marital dissolution proceeding, the burden of proof rests with the party claiming that property is nonmarital. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

### (a) Identification and Valuation of Ryan's Premarital Property

Ryan claims he had $121,793 in premarital assets, consisting of "a car, a bull, a livestock trailer, six (6) heifers [total cost value of $26,375, the '2012 premarital assets']," "cash in the bank of $33,137.94 [premarital cash]," and $62,280 (cost value) in additional assets identified on his 2011 tax returns (the "2011 premarital assets"). Brief for appellant at 19. Ryan disputes the district court's valuation of his total premarital assets at $21,307, and claims he should be credited with "premarital assets of $121,793." *Id*. However, Ryan does not explain why he should be credited with the full cost value of the 2011 and 2012 premarital assets regardless of age and depreciation.

We note that although the district court did not itemize or provide reasoning for valuing Ryan's total premarital assets at $21,307, the record reveals that this number correlates exactly with the depreciated value of Ryan's 2011 premarital assets (as identified in exhibit 82, the parties' 2012 joint federal tax return). We also note that the record reflects a total depreciated value of $3,383 for the 2012 premarital assets (based on a 2015 federal asset report).

At trial, Ryan acknowledged that the assets he purchased prior to his marriage were going to depreciate over time and that he was not "necessarily asking for a dollar-for-dollar reimbursement -- or accounting." He did not testify as to what would be a fair valuation for the 2011 and 2012 premarital assets. And on appeal, he does not he direct us to any evidence as to the value of such assets at the time the divorce was filed in July 2016 or at the time of trial in January 2018. Therefore, we cannot say the district court abused its discretion in valuing the 2011 and 2012 premarital assets using the $21,307 figure.

However, with regard to the premarital cash, exhibit 136 contains a document showing transactions on Ryan's FCS operating account (FCS Account) from before the parties were married on June 1, 2012. On May 31, it shows a credit of $33,137.94. While the FCS Account is characterized as a loan in some parts of the record, our review of the history of transactions (exhibit 57) on the account shows it was functioning comparably to a checking account. There are multiple withdrawals for sums used to pay off personal and/or farm expenses. Sometime after the parties wed, Jessica was added to the account. The record supports that before the marriage Ryan had overpaid past amounts owed and had continued to make payments against the account to maintain a credit balance. The premarital amount was clearly traceable, and thus Ryan should have received an offset for his premarital $33,137.94 credit balance. We modify the decree accordingly.

(b) Failure to Account for $15,000 Cash

Ryan alleges that the district court failed to account for $8,000 he claims Jessica had in an account from income earned during the marriage, along with a withdrawal of $7,000 from the FCS Account in July 2016. He claims this $15,000 should "be charged to Jessica." Brief for appellant at 19. Jessica does not dispute the existence of such funds at the time the parties separated, however, she contends the funds were used for living expenses.

Jessica explained at trial that before the parties separated in July 2016, she would buy needed items with her credit card and then make a payment of $2,000 from the FCS Account every month to pay off that credit card. According to Jessica, she and Ryan agreed they would continue handling finances the way they had in the past and that Ryan would continue giving her "the 2,000." She asserted that Ryan "froze" her "out" of the FCS Account in July 2016. Since she was denied access to the FCS Account, she claimed that for "July, August, September, October, November [2016], [she] spent $2,000 a month" from a separate account (containing her earnings from a skincare company) for living expenses. As for the $7,000 withdrawn from the FCS Account, Jessica indicated her final withdrawals were on July 6 for $2,000 "for [her] credit card" and $5,000 that "might have been a check to [her attorney]." Exhibit 57 reflects those withdrawals.

Ryan admitted he called FCS and had them decline Jessica's attempts to withdraw money from that account; he also acknowledged that the FCS account had been used for family living expenses. Ryan subsequently transferred money from the FCS account to his own personal

checking account, from which he paid for his own living expenses and over $6,000 in attorney fees.

The evidence does not support allocating $15,000 as an asset attributable to Jessica when the evidence shows that such funds were expended on living expenses and attorney fees in the same way Ryan continued to use funds originally from the FCS account to fund his living expenses and attorney fees. We find no abuse of discretion by the district court in declining to attribute such funds to Jessica as a marital asset when identifying, valuing, and dividing the marital estate.

### (c) Failure to Credit Ryan for Payment of Certain Obligations

Ryan asserts that various marital debts were not included in the property equalization. Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties. *Millatmal v. Millatmal, supra*. The burden to show that a debt is nonmarital is on the party making that assertion. *Id.*

Ryan claims he paid $1,700 towards a credit card account that Jessica was ordered to maintain, and that he paid $2,838.24 in mortgage payments that Jessica was also ordered to pay while she was living in the marital home. Both obligations arose under the temporary order. He suggests that the total amount of those two obligations ($4,538.24) should be allocated as assets benefitting Jessica, but also suggests that the $4,538.24 should be added to his liabilities when determining his net marital estate. Ryan also argues that he should have been credited with liabilities he claims were associated with the marriage, specifically $29,739 for 2016-17 cropland rent, $8,125 for 2017 pasture rent due, and $7,500 for 2017 machine rent due (total $45,364).

We decline to modify the decree as to these liabilities as requested by Ryan. The record supports that Ryan was able to pay off some marital debt and meet financial obligations during the pendency of the action by selling marital livestock while Jessica had no access to those proceeds. Given that marital assets were available to cover these liabilities, the absence of such amounts in the final property equalization calculation was not an abuse of discretion.

### (d) Acreage Classification and Valuation

#### *(i) Classification as Marital or Nonmarital*

In 2013, Ryan and Jessica purchased the Acreage from Ryan's parents, Norma and Vernon Schieffer. Ryan's parents had lived on that property since 1976, and prior to them owning it, Vernon's parents owned the property, and other Schieffers before them; the farm had been in the Schieffer family since 1932. According to Norma, when Ryan was living on the farm with them, he and his father raised hogs and cattle, farmed hay ground and planted; "Ryan was always involved with that." Aside from college and a brief job in another state, Ryan had always lived on the farm. The warranty deed, filed in August 2013, shows the conveyance to Ryan and Jessica as "joint tenants with right of survivorship." The purchase agreement reflects the total purchase price was $140,000, however Ryan said that he and Jessica paid an additional $20,000 in cash to his parents for the sale. Regarding the $160,000 purchase price, Jessica testified that it was "understood" the parties were "getting the property below value." According to an appraisal of the Acreage completed in April preceding the purchase (2013 Appraisal), the Acreage was valued at $420,000.

When Norma was asked about her intention underlying the transfer of the real estate to Ryan and Jessica, she responded that "they bought the acreage for a little amount, or below market price, and the rest was a -- gifted to Ryan." We note that the reduced purchase price was approximately 38 percent of the $420,000 valuation of the Acreage at the time of purchase, and thus resulted in immediate equity of $260,000. Jessica's equal share of this equity is the primary basis for her equalization payment. On appeal, Ryan contends the district court "gave no credit for the fact [that] nearly half [the Acreage's] value was a gift from Ryan's parents." Brief for appellant at 19.

We initially note that although the Acreage was deeded to Ryan and Jessica as joint tenants during their marriage, the manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's determination of how the property will be divided in an action for dissolution of marriage. See *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003) (disapproving of prior case to extent it could be interpreted to mean that nonmarital property which during marriage is titled in joint tenancy cannot be considered as nonmarital asset in dissolution of marriage action). How property inherited by a party before or during the marriage will be considered in determining the division of property must depend upon the facts of the particular case and the equities involved. *Id.* If the inheritance can be identified, it is to be set off to the inheriting spouse and eliminated from the marital estate. *Id.* (husband and wife held acreage in joint tenancy; trial court erred in not setting aside $19,000 from acreage as part of husband's inheritance because husband proved $19,000 of downpayment for acreage came from his separate inheritance funds).

There is very limited evidence in the record regarding whether or not part of that immediate equity in the martial home was intended as a gift to Ryan. However, a nonmarital interest in property may be established by credible testimony. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). According to Ryan's mother, Ryan and Jessica "bought the acreage for a little amount, or below market price, and the rest was a -- gifted to Ryan." This testimony was not contradicted by Jessica. However, evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id*. The district court was in the position of having to weigh the credibility of Norma's statement that the "the rest" was a gift to Ryan against her additional testimony acknowledging that the real estate deed did not reflect anything about a gift or inheritance in the deed itself.

Further, when real estate is conveyed in joint tenancy as it was in this case, any parol evidence to overcome the recorded legal title must be clear, unequivocal, and convincing. See *Salmon v. Salmon*, 219 Neb. 899, 367 N.W.2d 142 (1985) (only evidence to support claim of gift consisted of mother's testimony, which evidence was not so clear, unequivocal, and convincing as to overcome recitals in deed which conveyed property to parties as joint tenants). See, also, *Anstine v. Anstine*, 214 Neb. 808, 336 N.W.2d 552 (1983) (trial court's determination that real estate was acquired by purchase and substantial gift from husband's mother was in error when finding was not supported by substantial evidence and was in direct conflict with recorded legal title which conveyed real estate to both parties jointly; parol evidence adduced was not type which is clear, unequivocal, and convincing to extent it would overcome recitals in deed).

We cannot say the district court abused its discretion by treating the acreage as marital property and declining to set off any portion of the equity as a nonmarital inheritance.

*(ii) Acreage Value*

Ryan claims the district court incorrectly valued the Acreage at $420,000 rather than $303,000. He argues that the district court "provided no basis or explanation for its decision" to use the 2013 Appraisal that was "aged" and of "limited purpose." Brief for appellant at 21. The entirety of the district court's findings for adopting the $420,000 value was that (1) $420,000 was the value "consistently utilized by the parties in their farm credit applications beginning in 2013, and was reaffirmed by the parties in their credit application in 2016," and (2) the "other appraisals" of the Acreage were "inaccurate."

Ryan admitted that he relied on the 2013 Appraisal for several years thereafter when filling out the parties' balance sheets that were part of a process to secure and maintain credit from Farm Service Agency (FSA). Jessica argued at trial that since the parties used the 2013 Appraisal value on their financial documents for purposes of ongoing lending needs over the years, she and Ryan were necessarily bound by that figure. However, she provides no statutory or case law as authority to support that argument.

Ryan's requested valuation of $303,000 comes from a valuation of the Acreage reflected in an appraisal completed in October 2017 (2017 Appraisal) by a "Certified General Real Property Appraiser" with "White Realty & Appraisal." The 2013 Appraisal was completed by a different certified general appraiser. At Jessica's request, a comparative market analysis (not an appraisal) was prepared by a real estate company in December 2017; it projected an average sale price for the Acreage of $450,000, which is the amount that Jessica asked the district court to adopt as the value of the Acreage. Jessica testified that the parties had made improvements to the home on the property, reconstructing and installing new appliances and a "custom island" in the kitchen as well as making renovations to the living room.

Although it is understandable why the district court did not rely on the comparative market analysis, it is not clear why the court thought the 2017 Appraisal was "inaccurate." The district court did not explain that conclusion, and we find no evidence to support such a conclusion.

The 2017 Appraisal consists of 38 pages containing the appraiser's thorough investigation, research, and analysis, plus an addendum, including the appraiser's qualifications (reflecting he had been an appraiser since 1976), location maps, subject soil maps and data, a county property record card, a flood plain map, the deed to the parties, the "Nebraska Farm Real Estate Market Development Survey Tables," and subject and comparable sales photographs. The subject property appraised was the whole Acreage, described as "40.0 acres more or less of dryland cropland and building site with improvements." The appraiser reported that he inspected the Acreage on October 16, 2017, for the express purpose of writing a "narrative appraisal report" and determining an "estimate of market value" for the Acreage as of that date. The appraiser conducted a market research and analysis of the Acreage "using material furnished by [Ryan], material gathered from government records and information and facts from the physical inspection." The appraiser sought out all other information available regarding sales, comparables, rental rates, reproduction costs and replacement costs that are relative to the value of the Acreage. The appraiser considered three

approaches to value the property to arrive at a final estimate of market value: sales comparison approach, income approach, and cost approach.

Under the sales comparison approach analysis, the appraiser separated the evaluation of the land value from the dwelling value. The appraiser first determined land values of four comparable "Northeast Nebraska Dryland Cropland" properties located in Cedar County, Nebraska, or neighboring counties with similar soil ratings; dates of sale were from December 2016, and January and April 2017. The appraiser's sales comparison with those properties resulted in an estimated indicated land value (not including home) for the Acreage of $142,000 (rounded up from $141,600). Of significance, this was based on an average per acre value of $3,540 ($3,540 × 40 acres = $141,600). The report indicates that comparable sales were all "current post-2016 harvest sales that reflect the slight downturn in the market." The appraiser made adjustments for noted differentials in "soil type and slope" and "percentage of dryland cropland."

The appraiser then focused on the dwelling itself, completing a sales comparison of three comparable properties characterized as "Northeast Nebraska Rural Dwellings," all located in another neighboring county to Cedar County. The dates of sale of those three properties were November 2016, and June and August 2017. The report indicates, "Modern dwellings on small rural tracts are very desirable in the market place," and the appraiser selected "three sales of modern ranch style dwellings on rural tracts." The dwelling value of the Acreage by the sales comparison of those three properties was $143,000. Adding together the land value estimate ($142,000), dwelling value estimate ($143,000), and the remaining improvement value from a "machine shed" on the property, the appraiser concluded that the Acreage had a total value of $303,000 under the sales comparison approach.

Although not detailed here, the appraiser reached an estimate for the Acreage of $300,000 under the income approach and of $305,000 under the cost approach. In reconciling the three estimates under the different valuation approaches, the appraiser noted that similar comparable sales were used to reflect a reasonable estimate of value of the Acreage and that the sales comparison approach was given "strong emphasis" in the final estimate of value. The appraiser concluded that the market value of the Acreage as of October 16, 2017, was $303,000.

Within the 2017 Appraisal is an email the appraiser sent to Ryan's trial counsel that the appraiser inspected the interior of the home on the property on December 26. The appraiser noted that the exterior of the home was of "average quality construction." The interior was "fair to average quality, using lower cost laminate flooring and very little trim." The appraiser concluded that although the interior of the home was of a "slightly inferior quality" than one would have expected from the exterior inspection, "it would not [a]ffect the value reported on the appraisal report dated October 16, 2017."

In reviewing the 2013 Appraisal and the 2017 Appraisal, the most notable change in value is based on the change in the market value per acre for the 40 acres of land. In 2013, the average value per acre based on the sales comparables was identified as $7,000. This resulted in the 40 acres being valued at $280,000 at that time; the home itself was valued at $140,000. By 2017, the appraised value of comparable land was only $3,540 per acre. This resulted in the 40 acres being valued at $142,000 (rounded) in 2017; the home was valued at $143,000. The fluctuating cost per acre for farmland necessitates using an appraisal relevant to the time of valuing the marital estate.

And since there is nothing in the record to support the district court's determination that the 2017 Appraisal was "inaccurate," we conclude the district court abused its discretion by relying on the parties' balance sheets submitted for ongoing lending needs which reflected a valuation from the outdated 2013 Appraisal. Therefore, we modify the valuation of the Acreage to $303,000, the most recent and credible appraised value of the Acreage contained in the record.

### (e) Valuation of Farm Equipment

The district court allocated certain farm equipment to Ryan and valued it at $41,000. Ryan believes he proved the value of his farm equipment was only $13,385 based on an independent auctioneer's appraisal (exhibit 134) which reflects that amount. Jessica's proposed property settlement (exhibit 160) offered a valuation of $47,800 for the equipment. On appeal, Jessica argues that the value assigned to the equipment in the decree is supported by the balance sheets submitted to FCS (exhibits 98 and 99) and that it is "disingenuous and dishonest" for Ryan to now claim a significantly lower number than what was set forth on those balance sheets signed before and during the course of the action. Brief for appellee at 24. The 2015 balance sheet (exhibit 98) shows machinery and equipment was reported as $47,800 in value. The 2017 balance sheet (exhibit 99) shows Ryan signed off on reporting the value of machinery and equipment at $41,000.

Although we concluded above that determining the value of the Acreage based on financial documents relying on an outdated appraisal was an abuse of discretion in light of a more recent appraisal, we cannot conclude the same here. The values for farm equipment reflected on tax documents and financial statements are not vulnerable to the same fluctuations as in agricultural land values, as discussed above. Accordingly, we cannot find that the district court abused its discretion by relying on the 2017 balance sheet to value the farm equipment at issue.

### (f) Adjustments to Equalization Payment

Taking the district court's finding of $21,307 in premarital assets, and adding the $33,137.94 credit for Ryan's premarital FCS Account balance, the total amount to be offset for Ryan's premarital assets is $54,444.94, and we modify the district court's calculations attached to the decree accordingly.

With regard to the value of the Acreage, we modify the district court's value from $420,000 to $303,000. Making these adjustments to the district court's calculations results in the following allocation.

|  | Jessica | Ryan |
|---|---|---|
| Miscellaneous Assets | $10,000 | $83,858.04 |
| Acreage |  | $303,000.00 |
| Total Assets | $10,000 | $386,858.04 |
| Debts | -0- | [$219,353.86] |
| Net Marital Estate | $10,000 | $167,504.18 |
| Premarital Offset |  | [$54,444.94] |
| Adjusted Net Marital Estate | $10,000 | $113,059.24 |

Difference: $103,059.24 ÷ 2 = $51,529.69 to equalize

We therefore modify the district court's calculations in reaching the marital equalization judgment as set forth above, and modify the equalization judgment from $121,598.34 to $51,529.69. To the extent Ryan has not yet paid Jessica $5,000 of the equalization payment that was due upon entry of the decree, such amount remains immediately due. The decree's payment schedule for the balance of the equalization payment was spread out over 5 years. Applying the same payment schedule to the $51,529.69 equalization judgment results in monthly payments of $775 per month until the balance is paid in full. The decree is modified accordingly.

## 2. LEGAL AND PHYSICAL CUSTODY

Ryan claims the district court abused its discretion when it awarded Jessica sole legal and physical custody. He contends the award is untenable in light of the temporary order, entered about 14 months before trial, under which the parties shared joint legal and physical custody of Jasper and Eli. Ryan claims there were no significant changes in circumstances during that time. He alleges he was able to provide the children with a supportive environment while Jessica does not have a support network in Nebraska. Ryan claims the court "ignored Jessica's clear intent for seeking sole custody, which was to move back to Texas." Brief for appellant at 23. He believes the record reflects successful communication between the parties about healthcare updates, pick-ups and drop-offs, and adjusting parenting time schedules.

Following our de novo review of the record, we conclude the district court abused its discretion by changing the joint physical custody parenting time arrangement the parties had exercised for the 14 months leading up to the trial. The reasons provided by the district court to support awarding Jessica sole physical custody are not supported by the record. However, we cannot say the district court abused its discretion with regard to awarding Jessica sole legal custody based on actions taken by Ryan during the temporary custody period. Evidence pertinent to custody follows.

### (a) Jessica and Ryan Meet Online

In 2010, while Jessica was living in Virginia, Jessica's child, Dillon, was born. Jessica initially had sole custody of Dillon. Jessica subsequently met Ryan online. Once Jessica and Ryan became engaged, Jessica wanted to leave Virginia, and Dillon's father initiated an action in Virginia for custody of Dillon. Evidence of Virginia court records from an August 2011 hearing reflect that Jessica had twice taken Dillon with her to visit Ryan without telling Dillon's father in violation of a court order. In 2012, while that case was pending, Jessica moved to Nebraska to pursue her relationship with Ryan. Dillon's father was awarded sole custody of Dillon in April. Jessica said her parenting time with Dillon occurred during summers and alternating holidays. Jessica's mother thought Dillon was living in Colorado with his father at the time of the trial in this case.

### (b) Parties' Employment

Ryan (age 36) and Jessica (age 34) were married in June 2012 and were separated by July 2016. As of trial in January 2018, Jessica was working 30 to 40 hours per week at a bar in Yankton, South Dakota. She also provided marketing services under a contract for the company that owned

that bar and a restaurant, and she took similar marketing jobs as they came along. Ryan has a degree in architectural millwork and a "BA" degree in business management. He had raised livestock ever since he could remember. As a self-employed farmer, his operations consisted of raising cattle and hogs and farming (farmed 23 acres of land in 2017). He also managed a hog unit for Crofton Elevator, Inc. (Crofton Elevator) and "custom" fed some hogs owned by Crofton Elevator on the Acreage. Ryan set his own hours for his job at Crofton Elevator.

(c) November 2016 Temporary Order

At the October 24, 2016, hearing on temporary matters, numerous affidavits were received into evidence attesting to each parent's personal behaviors and parenting abilities; all of these exhibits are contained in the record before this court. According to Jessica's affidavit, Ryan had a "falling out with his parents," became depressed, and "started consuming large amounts of alcohol on a regular basis." She also claimed he had physically assaulted her on July 1 of that year and that she obtained a protection order which prohibited Ryan from entering the marital residence. (In her testimony at trial she said that on July 1 or 2, when the children were not present, Ryan "got physical" and prevented her from leaving the marital home; she acknowledged that during a deposition she had denied that Ryan had ever hit, punched, or kicked her, but she claimed Ryan was responsible for a bruise on her). Jessica claimed that despite the protection order, Ryan nevertheless entered the home "under the guise of seeing the minor children," and "trapped" her in the shower on one occasion. Jessica did not trust Ryan being alone with the children and requested that his "contact" be supervised. She expressed her belief that the children would not be safe with Ryan "given his inability to control his alcohol consumption and the amount of alcohol that he drinks on a daily basis."

In his affidavit, which was received without objection, Ryan acknowledged meeting Jessica on a dating website in November 2010. In April 2011, Jessica and Dillon came to Nebraska to meet Ryan for the first time. In June, October, and November, Ryan flew to Virginia to spend time with Jessica, and on November 4, Jessica informed Ryan she was pregnant. In March 2012, Jessica moved to Nebraska, and she and Ryan lived with Ryan's parents until they married in June. In August, Jessica and Ryan moved into the "farm house," and at this point in time, they "had a falling out with [Ryan's] family." According to Ryan, his family felt that "Jessica was not respecting the hard work they put into developing and caring for the farm, or the fact that this farm had been in our family for generations." He added, "At this time, I was required to support my wife, and as a result, my relationship with my family suffered." Ryan's mother confirmed this as well in her affidavit at the time, stating, "We as a family had a falling out with Ryan when he married Jessica." However, they were making amends "as of lately." Ryan's mother attested to Ryan being a "kind, loving, gentle and respectful person," and "an excellent dad." She noted that he attended to "all the boys' needs and is very loving and attentive."

Ryan expressed concerns about Jessica's marijuana use, having located marijuana and a pipe in Jessica's night stand drawer. He attached a copy of excerpts from "Jessica's notebook" which began with writings around December 2015 (as noted by Ryan, a month after Eli was born); Jessica's notes indicated her desire to engage in a relationship with a man named Dare who "is in LA." (A person named "Dare" is listed as a reference in a resume Jessica offered into evidence;

Dare is identified as a "Friend for 15 years.") Jessica wrote that she needed to move "there" for 6 months to "give it a shot," but that if what she currently has "is the best [she] can do then [she] will come back to it." "And if Dare isn't the one then God has only six months to put the right one in front of me in Houston. And he better be loaded." In March 2016, Jessica wrote about her excitement working with "Rodan & Fields," and also noted that she had "6 months to make it to LV." Ryan also pointed out in his affidavit that Jessica's online dating profile in May 2016 indicated that Jessica was "[s]eeking Men 29-39 years old within 50 miles of Houston, [Texas]."

Ryan included photographs of the boys and he expressed how the boys "enjoy life on the farm." They enjoyed spending time with Ryan "working with equipment and livestock"; they went fishing together and went to the "duck pond and fed the birds." Ryan also discussed the network of friends and family, and the ability for the boys to frequently spend time with their grandparents and great grandmother. At that time, Ryan did not object to Jessica having the temporary exclusive use of the marital home.

On November 8, 2016, the district court entered a temporary order granting Jessica and Ryan joint legal and physical custody of the children, with a week on/week off schedule. The order indicated it had examined the submitted exhibits. Therefore, at this point in time, despite being aware of the various concerns raised by each party against the other, including Ryan's alleged alcohol problems and the harassment and behaviors that led to the protection order earlier in July, the district court nevertheless determined it was in the best interests of the children that their parents share legal and physical custody.

(d) Evidence at Trial in January 2018

Most of Jessica's testimony at trial related to Ryan's behaviors preceding the temporary order. Jessica again addressed that when she and Ryan bought the Acreage in 2013, the relationship between Ryan and his parents "completely stopped." Ryan "really never recovered after that," meaning he became "depressed" and "turned to alcohol." Jessica maintained a calendar to mark "various things," such as "incidences with Ryan." Jessica confirmed that all the things she thought were important were included in the calendars, and when specifically asked about the 2017 calendar, she stated that it contained the "incidences" she worried about, such as times she claimed Ryan "blew and failed the Breathalyzer, times he harassed babysitters." "My requests to talk to [the children], and then getting denied." Her calendars for 2014 through 2017 were received into evidence.

Jessica testified there were "a lot of emotional breakdowns" where Ryan was not able to function properly, and after seeing a psychiatrist, he received a prescription for "anti-depressants and anxiety." Ryan denied taking anti-depressants at the time of trial. Jessica claimed Ryan threatened suicide more than once; Ryan denied attempting suicide but he "maybe said it" in the summer of 2016. Ryan agreed that at the beginning of 2016, things were not going well between Jessica and him, and that some issues revolved around Jessica's belief that he was excessively drinking alcohol. Ryan acknowledged that Jessica would ask him to use a breathalyzer as far back as early 2016, because she was concerned about him being around the children and drinking. Ryan said he consented to breathalyzer tests to prove to Jessica that she could trust him, but he believed the breathalyzer resulted in defective readings. However, Jessica made an audio recording around

the end of July 2016 during which Ryan showed up at the marital home "really distraught" and admitted he was an alcoholic. Ryan explained that the recording and other videos made by Jessica showed a "very small snapshot of [his] life when [he] was at an emotional high." He admitted he drank too much alcohol, and that he handled the commencement of the marriage dissolution poorly. He was "drinking too much," "trying to use that to soothe what was going on in [his] life," but it got to a point where he heard himself in the tapes and realized "this was not working anymore." He enrolled in anger management classes and counseling. He stated that he had "four siblings" with whom he had "broken ties with through this marriage, and it really hurt and bothered [him], and that was part of this all happening." But his family was "slowly coming back around," and he was going to "keep going in the right direction."

It is important to note that when aligning Jessica's testimony at trial about Ryan's behaviors related to alcohol consumption, harassing behaviors towards her, and his statements about harming himself, her calendar notations reflect that with one exception in 2017 (May 17--"Ryan ran me off road"), none of these problematic behaviors or concerns are noted for the entire 2017 calendar year. Almost the entirety of Jessica's testimony at trial with regard to concerns about Ryan's excessive alcohol use and his other negative behaviors were raised and argued before the district court prior to the court entering a temporary order granting joint legal and physical custody. These concerns simply were not an issue following the entry of the temporary order.

For the 14 months from November 2016 until trial in January 2018 ("temporary order period"), the parties had equal parenting time with their children using a week on/week off schedule. Most all of Jessica's entries for this timeframe relate to Ryan not responding to Jessica's attempts to alter parenting time or other failed communication issues. For example, there were some instances noted on Jessica's calendars in which she claimed she emailed Ryan about matters regarding Jasper and Eli only to receive no response. In one instance, Jessica asked Ryan to communicate over email but he refused. During the temporary order period, Jessica noted several instances in which she requested to communicate with or visit Jasper and Eli when they were in Ryan's care, but Ryan ignored or denied those requests (i.e., asking to "Face Time" Jasper and Eli on Valentine's Day; requesting to see Jasper and Eli the week of Eli's first birthday; asking to talk to Jasper and Eli on Jessica's birthday in 2017). There was testimony that Ryan did not allow Jessica's request to switch the temporary order holiday schedule so that Jasper and Eli could spend time with Dillon.

Also during the temporary order period, Jessica asserted that in March 2017, Ryan began immunizations for Jasper and Eli without her consent (email from Ryan indicates he informed Jessica about that medical decision after the fact). Jessica denied that Ryan told her in advance that he was taking the children to the doctor since the issuance of the temporary order. She claimed that Ryan never asked her if she wanted to join in those doctor visits. Ryan admitted that he had Eli baptized after the entry of temporary order and he "assumed" Jessica "did not care about baptism" since Jessica told him "she wasn't to be [sic] Catholic anymore." Jessica denied she ever told Ryan that.

Also during the temporary order period, Jessica said Ryan told her that he signed Jasper up for preschool after he had already done so. Ryan informed Jessica by email that he wanted to sign Jasper up for preschool, and in response, Jessica emailed Ryan asking to be involved and to decide

the matter together. Jessica said she received no response. About 1 month before preschool started (in August 2017), Ryan sent her "the packet" and she again asked to be involved but received no reply. "He said, 'I already gave you all the information [you] need.'" She decided to wait until the "night before" and asked to come and take pictures, to which Ryan told her she already received "'when it starts and everything.'" When Jessica showed up to Jasper's first day of preschool, she waited for Jasper and Ryan to arrive; Ryan left as soon as she approached them.

Ryan did not dispute that he enrolled Jasper in preschool before informing Jessica about it. However, he claimed that "in order to get into a small preschool, you need to get your name in there quick. I put his name down, and I heard no response from [Jessica] whatsoever about preschool until his first day, then she was interested, showed up, then nothing." He continued, "I let her know what I was doing, and she never objected to it." Regarding why he left after Jessica arrived at Jasper's first day of preschool, Ryan said he wanted Jessica to walk Jasper into preschool "since [he] had the morning with [Jasper]" and he did not want Jasper to "be undecided about should I go with Mom [o]r Dad." Ryan acknowledged times in text messages and emails when he was not responsive to Jessica's statements. He indicated his lack of responses sometimes were due to being recorded and, as a result, his being hesitant to write something "'wrong'" and he would not respond "if it wasn't pertinent to really something she really needed to know."

Ryan also acknowledged he had been placed on a period of 12 months' probation for disturbing the peace (his probation would be "completed in a week"). When asked if that was "reduced from a violation of a protection order," Ryan was not sure. He was monitored for the use of drugs and alcohol during probation. He claimed he had no positive tests for those substances. During trial, Ryan claimed he had not consumed alcohol for 15 months.

Ryan wanted the temporary parenting plan to be permanent. The parties exchanged the children at a gas station and the location was working well. He said Jasper and Eli had routines when they were with him (e.g., brushing teeth, story time, praying). He spoke about receiving help caring for Jasper and Eli from his parents who lived at a residence Norma said was about 5 minutes away from the marital home. Norma indicated her relationship with Ryan became strained during Ryan's marriage to Jessica and that she (Norma) did not spend a lot of time with the children in the past, but she got "along great" with Ryan, Jasper, and Eli at the time of trial. She said that she and Vernon helped transport Ryan's children to daycare or school. Norma observed Ryan assist the children with their meals, and she said that he "plays with them on the carpet . . . they play with the blocks . . . [Ryan] reads them bedtime stories, and . . . [h]elps them brush their teeth." She discussed Ryan's ability to cook "simple things," and has observed him help with baths. When asked if she was committed to working with Ryan and Jessica to provide family support for the children, Norma replied, "Absolutely. We do anything we can to help with these kids. They're very precious."

We note that although Jasper's preschool attendance record from August to December 2017 showed 21 total absences, Jessica admitted these were due to her not taking Jasper to preschool those days. Norma said the children were at her house "a lot of the time," estimating they were there three-quarters of the time. She indicated they were at her house after school (or daycare) and stay overnight there; that Ryan is there with them until they go to bed at night when they're at their house, and Ryan puts them to bed. However, Ryan estimated that Jasper and Eli

stayed with Norma and Vernon about "two to three nights, depending [sic]" per week. When asked about having his parents as a network of support, Ryan replied, "It's wonderful . . . that really helps me, especially with Jasper in school, when he gets picked up in the middle of the day . . . they're right there, two blocks away to get them. My dad works two blocks down the street." When Ryan has to get certain chores done earlier in the morning, he takes the boys to his parents' home and they'll "eat together and stuff, and I get them to school," or if he has to leave, his parents can take them to school. He did not stay overnight at Norma's house when Jasper and Eli stayed there. Ryan said he would sometimes eat with the children in the morning at Norma's house.

In Jessica's opinion, Jasper and Eli were doing "as good as they can" under the temporary parenting plan. She denied having "any family or support" in Crofton. Her mother lived in Virginia but she visited Jessica at least once a year. Jessica is from Texas. She stated it would be "nice to have an option to go back [to Texas] if Ryan doesn't want to be around the kids without having to go back to court."

### (e) District Court's Findings

In the decree, the district court set forth the following findings related to its decision to award legal and physical custody to Jessica. The evidence was "clear" that Jessica had been the primary caregiver of Jasper and Eli prior to the parties' separation in July 2016. During the pendency of the case, Ryan was "unable to effectively parent" Jasper and Eli and "abdicated that responsibility to his mother, the minor children's paternal grandmother," who provided 50 percent of the care for Jasper and Eli when they were in Ryan's care. Ryan "has a substantial substance abuse issue," evidenced by Jessica's testimony and the audio recording of Ryan heard during trial. Ryan had "demonstrated a lack of insight into his problem with alcohol." The district court found Ryan was unable to adequately parent Jasper and Eli because Ryan "traveled with [Jasper and Eli] in his motor vehicle after he had consumed alcohol beyond the legal limit."

In the district court's view, it was "clear" that coparenting with Ryan was "not a viable option." During the pendency of the case, Ryan showed he was "unable to work with [Jessica] in matters involving the parties' minor children." The district court further found that Ryan refused to share information with Jessica regarding having Eli baptized and Jasper's first day of school so that Jessica could participate in those events. Ryan had "refused to clearly communicate with [Jessica] regarding the issues of the parties' minor children while they were in his care."

### (f) Applicable Law

When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

The Parenting Act, Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2018), defines "[j]oint legal custody" as the "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." § 43-2922(11). Courts typically do not award joint legal custody when the parties are unable to communicate effectively. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents are unable to communicate face-to-face and there is level of distrust). However, the Parenting Act authorizes a trial court to award joint custody in dissolution actions if, after a hearing in open court, the court finds that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). See, also, *Leners v. Leners*, 302 Neb. 904, 925 N.W.2d 704 (2019) (award of joint legal and physical custody affirmed despite evidence parents had contentious relationship).

Physical custody is defined by the Parenting Act as "authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time." § 43-2922(20). When parents are exercising parenting time, they are performing parenting functions. *State on behalf of Kaaden S. v. Jeffery T., supra*. Parenting functions are defined to include maintaining a safe, stable, consistent, and nurturing relationship with the child; attending to the child's ongoing developmental needs, including feeding, clothing, grooming, emotional stability, and appropriate conflict resolution skills; attending to adequate education for the child; assisting the child in maintaining a safe, positive, and appropriate relationship with each parent and other family members; minimizing the child's exposure to harmful parental conflict; assisting the child in developing skills to maintain safe, positive, and appropriate interpersonal relationships; and exercising support for social, academic, athletic, or other special interests. *Id*.

The best interests of the child are the polestar of all child custody and parenting time determinations. *Id*. The Parenting Act presumes the critical importance of the parent-child relationship in the welfare and development of the child and that the relationship between the child and each parent should be equally considered unless it is contrary to the best interests of the child. *Id*.

## (g) Was There Abuse of Discretion?

The evidence shows that both Jessica and Ryan love their sons. And for the 14-month duration of the temporary order period, both parents shared an equal amount of parenting time with Jasper and Eli, alternating their parenting time on a weekly basis.

### (i) Abuse of Discretion With Regard to Physical Custody

During the 14 months of the temporary order period, there was no evidence of any of the harassing behaviors or alcohol abuse previously demonstrated by Ryan in July 2016 and for a few months thereafter. And while Ryan's probation status may have been a contributor to Ryan abstaining from alcohol during much of the temporary order period, the fact remains that he had no positive tests during probation, and had not consumed alcohol for 15 months at the time of trial. Therefore, we conclude the district court abused its discretion when basing its custody decision, at least in part, on Ryan having "a substantial substance abuse issue," as evidenced by Jessica's testimony and the audio recording of Ryan heard during trial, and that Ryan had "demonstrated a lack of insight into his problem with alcohol." All of such evidence preceded the temporary custody order which allowed for equal parenting time over the next 14 months, and thus had limited relevance to Ryan's ability to parent by the time of trial. This is especially so since there was no evidence of alcohol use at all, much less a "substantial substance abuse issue" at any time during the 14-month temporary custody period.

Another basis for the district court's custody decision was its conclusion that Norma provided half the care for Jasper and Eli when they were in Ryan's care, and that Ryan was "unable to effectively parent" Jasper and Eli and "abdicated that responsibility to his mother." However, the evidence does not support that Ryan was unable to effectively parent, nor does it demonstrate that Ryan abdicated his parental responsibility to his mother. Rather, the evidence establishes that Ryan's parents helped Ryan out in lieu of using a daycare provider, both before and after preschool or daycare while Ryan was working. Although Norma and Ryan's testimony conflicted as to how much cumulative time the boys spent with their grandparents, they both agreed that such time included some overnight stays and morning breakfasts. The evidence also showed, however, that Ryan was there with the boys during much of that time, performing parental responsibilities before and after work, and up through the boys' bedtime. The only time Ryan was not parenting during such times was when he left his parents' home in the evening when the boys were asleep; he estimated this to be two to three times per week. Arguably, at such times, he was abdicating his parental responsibility to the grandparents to supervise his children overnight. However, allowing the boys to stay overnight with his parents, who lived only minutes away, was a practical solution over waking the boys in the early morning to take them to his parents' home or a daycare on those days where farm chores required early morning attention. Ryan viewed his parents as a support network, which is not uncommon for working parents who have the good fortune to have grandparents or other relatives nearby to assist in providing care for children in lieu of other daycare options.

We find the evidence does not support the particular findings by the district court as discussed above, and that these reasons would have served as the only grounds for the district court to discontinue the joint physical custody arrangement that the parties had been exercising during

the 14-month temporary order period. There was no evidence that maintaining an equally shared parenting time schedule was anything but in the children's best interests. Accordingly, we conclude the district court abused its discretion by awarding sole physical custody to Jessica, and we reverse that portion of the decree and remand for entry of an award of joint physical custody, with the parenting plan modified to provide for parenting time to be exercised in a week on/week off basis as previously provided under the temporary order. Alternating holidays and other aspects of the parenting plan are not challenged on appeal and are affirmed.

*(ii) No Abuse of Discretion With Regard to Legal Custody*

The district court made other findings which we conclude are relevant to its decision to award Jessica sole legal custody. And because these other findings are supported by the record, we cannot say that the district court abused its discretion by awarding Jessica sole legal custody of the children. Specifically, the district court concluded that "co-parenting" was "not a viable option." The court found that Ryan demonstrated that he was unable to work with Jessica in matters involving their children. Specifically, the court pointed out that Ryan refused to share information about having a child baptized and about the first day of school so that Jessica could participate in those events. The court found that Ryan "refused to clearly communicate" with Jessica "regarding the issues of the parties' minor children while they were in his care."

Jessica testified that she communicated with Ryan via email about "[j]ust basic stuff because we couldn't talk during exchanges because . . . it would get elevated." Ryan claimed he was dedicated to communicating effectively with Jessica. We acknowledge that there are plenty of examples of text messages or emails between the parties in which they were able to communicate about matters involving the children. However, it is true that during the 14-month temporary order period, Ryan chose not to fully and adequately discuss fundamental matters related to the children with Jessica. Ryan took unilateral actions regarding the children's health (doctor appointments, immunizations), religion (Eli's baptism), and schooling (Jasper's enrollment into preschool). Ryan did not involve Jessica in making those decisions. Ryan had various excuses for not including Jessica, however, none of his excuses demonstrate a cooperative attitude about making important decisions with Jessica about the children. We do note, however, that Jessica likewise demonstrated an uncooperative attitude, in that Jasper's preschool attendance record from August to December 2017 showed 21 total absences; Jessica admitted these were due to her not taking Jasper to preschool those days.

Ryan is worried that the current custody arrangement will allow Jessica to move with Jasper and Eli to Texas. Jessica did express that she may want to move to Texas and she noted a lack of family support in Crofton. There was also evidence of her online dating profile in which she listed Houston, Texas, as her hometown and that she was seeking to date men in that area. However, even if Jessica had intentions to move with Jasper and Eli to any other state, this court's reversal of the physical custody award with directions to award joint physical custody and to restore the week on/week off parenting time should impact any plans in that regard. Further, the parenting plan under the decree requires either parent wishing to change his or her residence to "notify the other parent of such change in residence" and mandates that permanent changes to the

parenting plan "must be approved by the court to be binding and enforceable" if written agreement of the parties is not obtained.

Although the ideal situation is to have both parents cooperate in making important decisions for their children under a joint legal custody arrangement, we cannot say the district court abused its discretion by awarding Jessica the sole legal custody of the children based on the evidence presented at trial.

### 3. Standard of Proof Required for Custody Decisions in Dissolution Matters

Ryan asks that we adopt and require evidence to satisfy a "clear and convincing standard" before "any deviation is made from an award of joint legal and physical custody with shared and substantially equal parenting time." Brief for appellant at 24. Ryan asks this court to "announce a change to conform divorce law with juvenile law in all matters involving judicial decisions that impinge on the rights of a parent to raise a child." *Id*. He argues that "[d]ivorce law should catch up with the juvenile law and require clear and convincing proof before the parent child relationship becomes a subject for judicial intervention." *Id*. at 27. Ryan contends that "[o]nly clear and convincing evidence should authorize a court to determine that a child's 'best interests' may only be served by . . . awarding sole legal or physical custody to one parent over another." *Id*. He claims a change in the law is needed because the "'best interests of the child' standard is so vague as to suffer constitutional infirmities." *Id*.

However, Ryan did not raise at trial nor preserve on appeal any constitutional challenge to the laws governing child custody, and we will not address such constitutional issues here. Further, the changes in the law which Ryan seeks are not in the province of this court; such changes must necessarily be sought through legislative action.

### 4. Child Support

Ryan asserts that the child support order is excessive because his "current monthly expenses already greatly exceed his monthly income." Brief for appellant at 31. He requests "shared child support" or that child support be reduced to a "level within" his "means." *Id.* Because we have concluded that the district court erred by not awarding joint physical custody and maintaining the week on/week off parenting plan used during the 14-month temporary order period, child support will have to be recalculated. Accordingly, we reverse the child support order and remand for recalculation using a joint physical custody worksheet.

Further, on remand, child support should be calculated using the income information contained in the child support worksheet attached to the decree. Under the decree, noting the parties' education and work history, the district court determined both parties had an earning capacity of at least $15 per hour. The district court indicated that during closing arguments, the parties had requested child support be calculated using at least that amount for an hourly wage for the parties. The district court stated, "Child support will be calculated, based upon each party's respective, ability to earn an hourly wage of Fifteen Dollars ($15.00) per hour." In view of Ryan's historically fluctuating income, his stipulation at trial to his ability to earn $30,000 per year, and the fact that such an amount was used at Ryan's request for the child support calculation under the

temporary order, we cannot say that the district court abused its discretion by calculating Ryan's child support based on him earning $15 per hour. Even if Ryan's annual salary never quite reached $30,000, generally, a party cannot complain of error which the party has invited the court to commit. See *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). See, also, *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013) (husband claimed trial court erred in using very amounts he suggested court use for income calculation to determine child support; no abuse of discretion in relying on those amounts that were stipulated to and did not detrimentally affect children).

### 5. ATTORNEY FEES

Ryan claims the district court erred by awarding Jessica $10,000 in attorney fees. In an action for dissolution of marriage, the award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018). The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Id.*

Ryan argues that Jessica used marital funds of $5,000 to pay some of her attorney fees, but does not mention the evidence that shows he also used marital funds to pay his own attorney fees of at least $5,558.67 while the action was pending. Neither amount was charged to either party in the district court's division of the marital estate. Jessica offered her counsel's affidavit, claiming she had incurred a total of $16,064.60 in attorney fees up to the time of trial. She requested an award of all or a portion of those fees.

The district court found an award of attorney fees in Jessica's favor was equitable and warranted in light of Ryan's actions that "created substantial confusion" and his "failure to provide an adequate accounting of his activities in relation to the marital assets of the parties until shortly before trial." Further, Ryan's "lack of transparency" in financial dealings during the pendency of the action and his "possession and control over all of the income producing assets throughout the course of this litigation" caused Jessica's counsel to incur additional time and expenses in preparing the case for trial.

Under our de novo review, and given the district court's stated reasons for awarding attorney fees, we cannot say it was an abuse of discretion for the district court to award Jessica $10,000 in attorney fees.

### 6. ORDER TO PAY MORE THAN IS EARNED

Ryan claims the district court erred by ordering him to pay more than he earns. He argues that the decree requires him to pay fixed amounts of at least $3,116.24 per month. However, in light of this court's modification of the equalization judgment, his obligation on that judgment has been reduced from $1,900 per month to $775 per month. Also, child support will be reduced when using a joint physical custody worksheet. As a result of the equalization modification and the child support obligation reduction, Ryan's monthly obligation will be significantly reduced. We therefore decline to address this assigned error further.

## VI. CONCLUSION

We modify the district court's October 29, 2018, decree to reflect the adjustments in premarital values and the Acreage value noted above, resulting in a modification of the marital equalization judgment from $121,598.34 to $51,529.69, with monthly payments on the equalization reduced from $1,900 per month to $775 per month. We reverse the district court's award of sole physical custody and remand for entry of an award of joint physical custody, with the parenting plan modified to reflect a week on/week off parenting time schedule. We reverse the child support judgment and remand for recalculation using the joint physical custody worksheet and the incomes used in the worksheet attached to the decree. In all other respects, the decree is affirmed.

AFFIRMED IN PART AS MODIFIED, AND IN PART
REVERSED AND REMANDED WITH DIRECTIONS.

RIEDMANN, Judge, concurring in part, and in part dissenting.

The majority finds that the district court abused its discretion in valuing the Acreage at $420,000 rather than $303,000 and in awarding sole physical custody of the parties' children to Jessica. Given our abuse of discretion standard and the evidence provided by the parties, I respectfully dissent.

VALUATION OF ACREAGE

The division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003).

The evidence reveals that the Acreage consists of 40 acres of dryland cropland on which a residence and outbuildings are located. When the parties purchased the Acreage in 2013 they had an appraisal prepared which revealed a value of $420,000. The parties consistently utilized that $420,000 value in their farm credit applications from 2013 to 2016. Even as late as April 10, 2017, Ryan verified on their balance sheet that the value of the Acreage was $420,000

Jessica testified that she has some limited real estate education consisting of college real estate courses and that she was employed with a commercial real estate company and a title company from 2011 to 2014. She testified that in addition to that education and experience, she performed research into what other farms were being sold for and calculated a value of $450,000 for the Acreage. She confirmed that the taxed assessed value of the property was $335,690, which was more than the 2017 appraisal of $303,000 that the majority concludes should have been used.

As the owner of the land, Jessica was qualified to estimate the value of the Acreage, even without the additional foundation upon which her valuation was based. See *Langfeld v. Department of Roads*, 213 Neb. 15, 328 N.W.2d 452 (1982) (owner who is shown to be familiar with value of his land shall be qualified to estimate value of such land for use to which it is then being put, without additional foundation). The district court had before it conflicting evidence as to the value of the Acreage, and as the trier of fact, was not required to accept the appraiser's valuation. See *Thompson v. Thompson*, 18 Neb. App. 363, 782 N.W.2d 607 (2010) (expert opinions not binding on court).

We review the trial court's decision for an abuse of discretion. See *Schuman v. Schuman, supra*. A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.* (no abuse of discretion in accepting one valuation over another).

Based upon Ryan's continued representations in his balance sheets that the value of the Acreage was $420,000, Jessica's opinion that the Acreage's value was $450,000, and the fact that the 2017 appraisal was below the tax assessed value, I find no abuse of discretion in the district court's finding that the Acreage should be valued at $420,000.

PHYSICAL CUSTODY OF CHILDREN

Our abuse of discretion standard of review also governs the outcome of the district court's order awarding sole legal and physical custody to Jessica. See *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). The majority concludes that the district court did not abuse its discretion in awarding Jessica sole legal custody, but implies that because the behaviors in which Ryan engaged which led the court to award sole physical custody to Jessica occurred prior to the temporary order, they were not a basis for changing the joint physical custody that had been temporarily awarded. The majority states, "All of such evidence preceded the temporary custody order which allowed for equal parenting time over the next 14 months, and thus had limited relevance to Ryan's ability to parent by the time of trial." I disagree that the court abused its discretion in relying upon such evidence in awarding permanent physical custody to Jessica and that it had limited relevance to Ryan's ability to parent by the time of trial.

The majority outlines in detail the trial testimony and the district court's order regarding physical custody so it is unnecessary to reiterate it here except as it relates to this dissent. What the majority fails to detail, however, is the evidence that was offered at the temporary hearing that led to joint physical custody and how that evidence was expounded upon at trial. In a modification hearing the determination of whether a material change in circumstance occurred is determined by the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). Similarly, in a dissolution action, whether the evidence produced at a trial is such that had it been presented at the temporary hearing it would have persuaded the judge to rule differently is relevant to a determination of whether a district court abused its discretion in awarding permanent custody.

The majority is correct that Jessica provided an affidavit at the temporary hearing that outlined her claims of Ryan's alcohol consumption and physical abuse of her. She attached no supporting documents; therefore, her allegations were the sum and substance of Ryan's behavior. In contrast, Ryan offered his own affidavit alleging that Jessica has a habit of using marijuana and expressing concern over her ability to maintain a clean and safe house and to empathize with others. He provided text messages to prove that the parties "are able to communicate effectively." He proposed a week on/week off parenting schedule. Ryan also offered 12 additional affidavits, including one from his pastor and another from his therapist, attesting to his ability to parent his

children. Based solely upon this limited evidence, the court awarded temporary joint physical and legal custody.

At trial, Jessica proved her allegations of Ryan's alcohol usage and physical assaults through extensive testimony and audio and video recordings. They were no longer simply her perception of events outlined in an affidavit. Yet, the majority concludes that "[a]lmost the entirety of Jessica's testimony at trial with regard to concerns about Ryan's excessive alcohol use and his other negative behaviors were raised and argued before the district court prior to the court entering a temporary order granting joint legal and physical custody." I disagree.

At trial, in addition to Jessica testifying in detail as to Ryan's actions regarding alcohol use and physical abuse, the court was able to listen to and observe Ryan's actions through recorded audio and video. Had this evidence been offered at the temporary hearing, it may have been sufficient for the court to award Jessica temporary sole custody. Regardless, the evidence at trial was relevant in assessing Ryan's credibility and to whom permanent custody should be awarded.

At trial Ryan denied that he was an alcoholic and that he had anger problems. However, Jessica offered an audio recording of Ryan admitting he is an alcoholic and a text message in which he requested that she bring him a beer at 11:39 in the morning. She also offered records from Ryan's counselor verifying that he requested anger management counseling. Additionally, Jessica offered a video depicting Ryan drinking, driving, and physically abusing her, all of which he denied on the stand. And although these events predate the temporary hearing, Ryan's denial of these events occurred at trial. Considering the above evidence that the court received at trial, I cannot find that basing its custody decision in part on its conclusions that Ryan "has a substantial substance abuse issue," had "demonstrated a lack of insight into his problem with alcohol," and was unable to adequately parent the boys because he "traveled with [them] in his motor vehicle after he had consumed alcohol beyond the legal limit," constituted an abuse of discretion, nor are such reasons unsubstantiated by the evidence.

The majority also faults the district court for its conclusions that Ryan was "unable to effectively parent" the boys and "abdicated that responsibility to his mother, the minor children's paternal grandmother," who provided 50 percent of the care of Jasper and Eli when they were in Ryan's care. While characterizing Ryan's dependence upon his mother as abdicating his parental responsibilities may be overly harsh, the testimony is uncontroverted that Ryan depended heavily upon his mother to provide care before and after school and overnight for the children. According to his mother, they were with her "three-fourths of the time." The majority describes this as "a practical solution" to Ryan's work schedule with which I do not disagree; however, given the option of awarding custody to a parent who must leave his children 50 to 75 percent of the time, including overnight two to three times a week, with their grandparents versus a parent who is able to be present with them more consistently, it was within the court's discretion to determine the latter was in the children's best interests.

Finally, the majority points to the district court's findings that during the pendency of the case, Ryan showed he was "unable to work with [Jessica] in matters involving the parties' minor children," that he refused to share information with Jessica regarding having Eli baptized and Jasper's first day of school, and had "refused to clearly communicate with [Jessica] regarding the

issues of the parties' minor children while they were in his care." All of these conclusions are supported by the record.

Jessica testified that she requested on multiple occasions that Ryan either allow her to talk to or see the children during his parenting time, but he refused. I acknowledge these requests came during Ryan's parenting time and he was under no obligation to grant her requests; however, it exemplifies his unwillingness to be flexible and do what is in his children's best interests. On one occasion, Jessica simply wanted to speak with the boys on her birthday; on the other, she requested a holiday switch between Thanksgiving and Christmas so the boys could spend time with their half brother who lives out of state. According to Jessica, Ryan initially agreed and then reneged on the deal.

Regarding Eli's baptism and Jasper's first day of school, the evidence is disputed regarding what information Ryan shared with Jessica and when it was shared. However, when the evidence is in conflict, an appellate court considers, and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Hiller v. Hiller*, 23 Neb. App. 768, 876 N.W.2d 685 (2016). The district court did not abuse its discretion in finding that Ryan failed to effectively communicate with Jessica regarding the children.

Jessica testified the temporary order was not working because Ryan would not coparent with her. He was nonresponsive to questions she would ask about the children's health after they returned from his house. According to Jessica they could not talk during exchanges because "it would get elevated." She offered exhibits of emails she sent to Ryan after the temporary order was entered regarding the children to support her allegation that he would not respond to her. She found these "indicative of [her] trying to communicate with Ryan." Jessica described the children as doing "good" but explained that "good is not flourishing."

Where there is evidence adduced at trial that a joint custody arrangement is not in the minor children's best interests, it is not error to award sole custody to one parent over another. See, *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (changing temporary joint custody to sole custody in decree). Here, the majority attempts to hold the district court to its joint physical custody determination made in the temporary order by focusing on a lack of evidence that Ryan either consumed alcohol or abused Jessica for the 14 month period that the temporary order was in place. It is important to note that Ryan was subject to a protection order during much of this time and was on probation for nearly 12 months during this period which likely stifled his behavior. Moreover, there is no authority that limits a district court from considering events that took place prior to the temporary hearing when determining permanent custody. The very nature of a temporary hearing exemplifies the danger in imposing such a limitation. For the reasons stated above, I find no abuse of discretion in the district court's decree awarding sole physical custody to Jessica.

Based upon the evidence presented at trial, the district court did not abuse its discretion in its valuation of the Acreage, nor did it abuse its discretion in awarding sole physical custody of the children to Jessica. I would therefore affirm the district court's order on these two issues. As to the remainder of the majority's opinion, I agree.